### BOSS et al. v. HARDEE.

#### No. 7244.

United States Court of Appeals for the District of Columbia.

Argued Jan. 16, 1939.

Decided Feb. 20, 1939.

752

Frederic D. McKenney, John S. Flannery, and G. Bowdoin Craighill, all of Washington, D. C., for appellants.

Swagar Sherley, Charles F. Wilson, and H. B. Weaver, Jr., all of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

This case is on appeal for the second time. 68 App.D.C. 75, 93 F.2d 234. On the first we remanded to the trial court with instructions to make definite findings of fact. Thereupon the decree was set aside, and the parties were given leave to amend their pleadings and present further evidence. Plaintiffs amended their bill, defendant answered, additional evidence was taken, and the trial judge filed amended findings of fact, to which the parties agreed. On the basis of these findings plaintiffs' bill was dismissed. From this decree the present appeal is taken.

The facts are undisputed and show that on February 28, 1933, the Commercial National Bank of Washington, D. C., became insolvent. The appellee, Hardee, is the receiver. The appellants, co-partners, are engaged in general real estate business in Washington and vicinity. For more than 30 years they had been customers and depositors of the bank. Whenever they borrowed money for the conduct of their business, they deposited with the bank ample security. On the date of the bank's insolvency they were indebted to it in the sum of $118,000, evidenced by promissory notes and secured by collateral. They then had on deposit in the bank, $54,090, segregated into 6 accounts designated on their own books, and presumably also on the bank's books, as: (a) Insurance Department; (b) Rent Department; (c) Sales Department; (d) General Account; (e) Special Account; (f) Collection Account. Checks on these several accounts had been drawn in the firm name by a member of the firm, and across the end of each check was printed in red ink the particular account to which the check should be charged. After the bank closed, the appellants made demand upon the receiver to set off the total of the deposits against the firm's indebtedness but, except to the extent of $3,746.93, representing the sum of

■ 753

the amounts in the General Account and the Special Account, plus an adjusted Rent Department item of $635, the receiver refused to make the set off. The appellants then brought this suit to compel the receiver to set off the total amount.

Appellants assert in their bill that all the deposits were owing to them in their own right as partners. The receiver, however, contends that the deposits in question belonged to appellants, not in their own right, but as agents for their clients and customers. In remanding the case on the former appeal, we said:

"There are no findings of ultimate facts, and we are unable to determine what ultimate facts the trial judge had in mind as a basis for his conclusions of law and decree. For example, there is no finding upon what, from the pleadings and briefs, is made to appear a crucial issue—the question whether the appellants were mere debtors, or whether, on the contrary, they were agents, of their clients." Boss v. Hardee, 68 App.D.C. 75, 93 F.2d 234, 235.

■ Appellants' business consisted partly in collection of rents, and management and operation of properties, in behalf of owners of improved real estate; in constructing and contracting with others to construct buildings, and in the latter case, frequently, in advancing funds during the progress of the work; in selling note issues secured by trusts on buildings so constructed, and in collecting interest and principal on the notes and remitting to purchasers on due dates. They were also engaged in writing policies of insurance on buildings and in collecting premiums from the assured on such business, and in representing as brokers or agents both the owners of properties desiring to sell and prospective purchasers. In all of these respects appellants received and handled for the persons with whom they did business, considerable sums of money. Loans by the bank to appellants were made by credits to the General Account, which were transferred to other accounts as necessity arose. In return appellants gave their firm notes, payable generally in 90 days. Appellants described their own business as conducted under one head with separate departments for facilitation in accounting, the main purpose being to make each account show its own assets, liabilities, and net worth. The transactions of appellants as the result of

these different activities were reflected in one or the other of the separate accounts, and in the view we take of the case it is necessary to examine the findings in relation to each of the accounts in order to determine whether appellants were mere debtors or were trustees for their clients in all or any of the various activities we have described. The answer in its final result depends upon the relations of the parties and their intentions, to be ascertained by a consideration of their words and conduct in the light of all the circumstances. Restatement of Trusts, Sec. 12 and comment. If the relationship of appellants to the persons for whom they acted in these various matters was that of debtor, the set off was allowable. If the relationship was fiduciary, it was not. The test is—to whom did the deposit in the bank belong as of the day of the bank's insolvency? Dakin v. Bayly, 290 U.S. 143, 54 S.Ct. 113, 78 L.Ed. 229, 90 A.L.R. 999. And this brings us to an examination of the accounts separately.

### First. Insurance Department.

■ This account consisted of money collected by appellants from sundry customers for premiums on fire insurance. The finding is that appellants had business relations with 6 or 7 fire insurance companies. As each policy was written, a report was sent to the insurance company, and appellants' account was charged with the net amount due. At the end of the month a check was sent to the company for the total net premiums whether or not such premiums had been collected. The companies by agreement each gave appellants a credit of 60 days from the time each policy was written within which to pay their account with them. If appellants permitted policyholders to defer a payment beyond 60 days, as for instance by taking their customer's note, they assumed the obligation and had to pay the company. Stated shortly, the agreement between appellants and the companies required immediate notice of the writing of insurance and payment of the net amount due within 60 days. In actual operation appellants availed of the credit only to the extent of 30 days. The finding of the court in this respect is supplemented by the evidence of an official of one of the companies that they looked solely to appellants for the payment of the sums due. In our opinion the manifest intention of the

parties shown by this course of dealing was to establish the relationship of debtor and creditor. Both parties indubitably understood that when premiums were collected appellants were to have the use of the money in their business for the allowed credit period of 60 days. An understanding of this nature does not create a trust. It does not show an intention that the money shall be kept as a separate fund for the benefit of the company. It shows, we think, the contrary, and there is nothing in the manner in which the accounts were kept on the bank's books which affects this conclusion. As was said in Northern Sugar Corporation v. Thompson, 8 Cir., 13 F. 2d 829, 832, the purpose was no more than to facilitate the keeping of their accounts and the separation of transactions occurring in their several departments.

*Second. Rent Department.*

The court below found that this account consisted in part of rents collected from tenants of properties belonging to various landlords. Appellants paid out of this account for repairs and operating expenses of the properties and advanced money out of the account for taxes on properties of various landlords when the amounts to the credit of the landlords were not adequate, and subsequently collected such payments from the particular landlord. No landlord ever claimed that he had any interest in any particular bank account of appellants. The question never arose prior to the closing of the bank, but at the trial of the case three landlords testified that they paid no attention to the bank on which the check in payment of rents was drawn but looked to appellants as owing them money and held appellants responsible to account therefor.

Undoubtedly, the rule is that when a landlord's agent receives rent money from the tenant, he receives the landlord's money, and unless the relation of debtor and creditor is created by agreement express or implied, the agent is trustee for the landlord and not his debtor. Wells v. Collins, 74 Wis. 341, 43 N.W. 160, 5 L.R.A. 531. Admittedly there is no proof of express agreement or consent on the part of the owners of the properties that appellants should retain the rents subject only to their responsibility to account on demand. The narrow question, therefore, is whether in the course of dealing between the parties there was implied assent to the use of the money in the agents' business.

Appellants insist that this question should be answered in the affirmative, and to sustain their theory point to the facts:

1st, that the course of dealing between appellants and the bank over more than a quarter of a century shows unmistakably that neither appellants nor the bank regarded or treated the deposits as trust funds—the bank on its part exacted of appellants from time to time financial statements showing assets, liabilities, and net worth. These statements invariably lumped the money in bank under whatever heading in a single sum, and appellants' credit rating with the bank was based on this showing. The bank likewise exacted a loan agreement, the effect of which was that the bank should have the right upon default of payment of any note to charge the same against any and all funds to appellants' credit in bank;

2nd, that as to the rent account the findings and evidence show that appellants deposited in this account not only the rents collected from properties of clients but from their own properties and advanced out of this fund frequently in payment of taxes and expenses of operation for their clients money in excess of that then due such clients;

3rd, that the nature of the business done by appellants and the course of dealing between them and their clients necessarily brought home to all such clients notice of the fact that all rents collected, whether for them or for appellants, were commingled and used by appellants in the regular conduct of their business.

We think the fact alone that the bank dealt with appellants without notice that the funds were trust funds is not conclusive, for the question is not the knowledge of the bank but the fact whether the debts and the deposits were mutual. Nor does the fact alone that appellants put money of their own in the account conclude the question, Central National Bank v. Connecticut Mut. Life Insurance Company, 104 U.S. 54, 26 L.Ed. 693; nor that the money from this source was used sometimes in excess of that due a particular client. The question, as we think, turns upon the view properly to be taken of the relationship of the parties considered in connection with the general conduct

of the business in which appellants were engaged and of which their clients had knowledge. The question is close, and the record is not as illuminating as we should like, but it seems to us to be clear that, not only did appellants never intend to treat the rent collections in any other or different way than their own funds, but that as a matter of necessary fact their clients were apprised of this purpose. As a matter of bookkeeping convenience, they deposited their own and their clients' funds in the account carried on their books as "Rent Department". They used this fund in the payment of repairs, upkeep, and operating expenses, including the wages of servants and attendants, gas, electric, and heating bills, and in the payment of taxes, as the result of which they were at times indebted to one client and another client was indebted to them. They kept the account current or nearly current by putting into it sufficient funds from other accounts to keep it in balance, and they at all times had, either in this account or in the account of some other bank or on their books in the shape of receivables or other assets, money in excess of the total at any time due any clients. If appellants had been agents for a single landlord, the case would have been entirely different. The strict rule of accountability and of agency would, in the absence of an express agreement to the contrary, have applied, but they were dealing with many clients, owners of many pieces of property, and held themselves out generally to such persons as agents for the management of their properties and the collection of their rents. And the testimony of several of their clients, which may be considered typical of all, was that they had never given consideration to the methods adopted by appellants of handling their funds but had looked entirely to appellants' personal credit for payment.

The courts have for many years applied the debtor-creditor rule to banks in the collection of checks and remittance of the proceeds, the principle of which is that the custom of banks contemplates that upon the collection of a check the proceeds shall go into the general fund to be used in the general stream of the bank's business. Blakey v. Brinson, 286 U.S. 254, 52 S.Ct. 516, 76 L.Ed. 1089, 82 A.L.R. 1288; Squire v. American Express Co., 131 Ohio St. 239, 2 N.E.2d 766; Dunlop S. & G. Corp.

v. Hospelhorn, 172 Md. 279, 191 A. 701. There is no reason that we know of why this rule should not apply in the case of a business like that in which appellants were engaged, in the circumstances we have narrated here. The evidence here, as we think, tends to show both that the clients of appellants understood that their money was being used in the general stream of appellants' business and that the nature of the business, as much as in the case of a bank, required in its orderly conduct that this should be the fact. When the bank failed appellants had in this account approximately $2,000 less than the aggregate amount due clients but, as we have seen, they had in this account on their books, either in bank or in the shape of receivables, amounts in excess of the total amount due any or all of their clients. They proceeded after the failure of the bank to pay these clients in the normal course of business, and at the time of the payment of the second dividend by the bank to depositors they had paid over all sums owing by them at the time of the bank's failure. It seems to us a reasonable conclusion from all of these facts that both before and after the bank's failure it was mutually understood by course of dealing that the obligation to do this was binding upon all of their assets, however invested and wherever situated, and was not a specific charge upon any particular account. We think, therefore, these circumstances take this deposit out of the ordinary rule, and that as to it the appellants occupied to their clients, whose money was in this fund, the relation of debtor and creditor.

### Third. Collection Account.

But what we have just said as to the Rent Department does not apply to the money in the Collection Account. That fund, as the finding shows, arose out of the collection of monthly interest by appellants on first trust notes belonging to sundry persons. There is no definite finding, nor is there any evidence, of the precise terms under which the collections were made. The deeds of trust securing the notes are not in evidence, and we are not advised whether appellants in collecting and disbursing the interest money acted as agents for the payors or the noteholders. But in either case there is no finding of assent to use of the money or of knowledge of its use. Nor is there any-

thing in the course of dealing between the parties to show intent. As we have the record, all that appears is that appellants collected the money as agents, and in that view, without more, they could not validly commingle it with their own funds.

*Fourth. Sales Department.*

■ The finding as to this deposit is that the money was received from purchasers of real estate and subsequently disbursed to the sellers at the conclusion of the transactions. We take the finding to mean that when appellants as agents for a seller of real estate made a contract and received earnest money or in some cases the whole sum to be paid over upon settlement of the transaction, they retained the money and deposited it temporarily in this account. If that was all, the payment was received in a fiduciary capacity, and to relieve it of that earmark it was necessary for appellants to show more than we are able to find in the record.

Counsel, however, emphasize what they call the finding of ultimate fact, that:

"Prior to February 28, 1933, plaintiffs had no agreement with any of their customers that any funds would be earmarked or segregated as trust funds for them, or that any customers would have any lien upon or interest in any funds deposited to the credit of plaintiffs in the Commercial Bank or elsewhere. No particular deposit was ever earmarked as a trust fund for any particular customer."

But this does not bridge the gap we have pointed out. The failure to earmark trust funds and the absence of agreement that any customer would have an interest in a particular fund, are immaterial. The controlling circumstance is the absence of any consent, express or implied, to the use of the funds in appellants' business, for lacking this the responsibility of agency continued, and equity will follow the fund through any number of transmutations and preserve it for the owner as long as it can be identified, no matter in whose name the legal right stands. Central National Bank v. Connecticut Mut. Life Insurance Co., 104 U.S. 54, 26 L.Ed. 693. If the money in accounts numbers 3 and 4 belonged as of the date of the bank's failure to appellants as agents for their customers or clients, appellants cannot set it off against their own debt. Gray v. Rollo, 18 Wall. 629, 21 L.Ed. 927; Thomas v. Potter Title & Trust Co., D.C., 2 F. Supp. 12.

We are of opinion that the set off as to accounts numbers 1 and 2 should be allowed and as to 3 and 4 should be disallowed.

Reversed in part; affirmed in part; costs to be divided equally.